IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MICHAEL STEVEN FLORES,

     Plaintiff,

    v.                                  1:19-cv-00784-LF-JHR

LOUIS DEJOY,[1] Postmaster General,

     Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

THIS MATTER comes before the Court on defendant Louis DeJoy's Motion for

Summary Judgment.  Doc. 40.  Plaintiff Michael Steven Flores opposes the motion.  *See* Docs.

44, 46.[2]  The motion was fully briefed on March 1, 2021.  *See* Docs. 49, 50.  The parties

consented to my entering final judgment in this case.  *See* Docs. 14, 16, 17.  For the following

reasons, I GRANT defendant's motion.

I.     **<u>Statement of Facts</u>**[3]

Mr. Flores is a Hispanic male who was born in 1951.  UMF 1.  He was 60 to 61 years old

when the events alleged in the complaint took place.  *Id.*

---

[1] Louis DeJoy became Postmaster General on June 16, 2020 and is automatically substituted as the defendant in this action.  FED. R. CIV. P. 25(d).

[2] Mr. Flores filed two almost identical responses, but only the second version contains the numbered exhibits on which he relies.  *Compare* Doc. 44 *with* Doc. 46.  The first version contained exhibits that were not numbered.  *See* Doc. 44.  Consequently, the Court (like defendant) will rely on and cite only to the second response (Doc. 46), filed on February 22, 2021.  *See* Doc. 49 at 1 n.1.

[3] Mr. Flores does not specifically dispute, and therefore admits, defendant's Undisputed Material Facts (UMFs) 1−7, 10–12, 14, 16–18, 20, 23–34, 40, 42, 43, 48, 50, 51, 53, 54, and 59, which are contained in Doc. 40 at 2–10.  *See* Doc. 46 at 2−8.  Consequently, for these facts, the Court will rely on the UMF.  For facts that Mr. Flores disputes, the Court will cite to the relevant exhibits.

In 2011 and 2012, Mr. Flores worked as a Manager, Post Office Operations ("MPOO") at the Executive Administrative Schedule ("EAS") 25 level in Albuquerque. UMF 2. As an MPOO, Mr. Flores was responsible for overseeing operations at various post offices in New Mexico, including post offices in Santa Fe and Roswell. UMF 3. As an MPOO, he was responsible for ensuring the timely delivery of mail as well as ensuring compliance with union agreements that covered rural carriers. UMF 4. Mr. Flores's immediate supervisor in December 2011 was Lawrence James, who was the District Manager of Arizona and New Mexico. UMF 5.

### A. Letter of Warning and First EEO Complaint

On December 13, 2011, the Roswell Post Office experienced a service failure where approximately 28,714 pieces of first-class mail were not timely dispatched to their intended destination. UMF 6. Because of the seriousness of this service failure, Mr. James held a teleconference on December 19, 2011 to determine its root cause. UMF 7. During the teleconference, Mr. James also asked Mr. Flores about violations of labor agreements with rural carriers because of inadequate staffing. Doc. 40-2 at 13–14.[4] Under the labor agreements, rural carriers could not work more than twelve hours at a time. *Id.* at 11. Mr. Flores was aware of the "12-hour" violations involving rural carriers in Santa Fe when he spoke with Mr. James at the teleconference. *Id.* at 13–14, 17. According to Mr. Flores, hiring additional carriers in Santa Fe was very difficult because "its cost of living is prohibitive and most new hires . . . must commute from Albuquerque." Doc. 46 at 2.

A letter of warning ("LOW") is the lowest form of discipline at the United States Postal Service ("USPS"). UMF 10. Although a LOW remains in an employee's personnel file for two

---

[4] When citing to the exhibits, the Court cites to the CM/ECF docket and page numbers, rather than the internal page numbers of the particular exhibit.

years, it does not affect the employee's pay, grade, benefits, title, or job responsibilities. *Id.* The next highest level of discipline is a letter of warning in lieu of time-off suspension ("no time-off letter," or "NTOL"). UMF 11. An NTOL is equivalent to a time-off suspension, even though no suspension is actually imposed. *Id.* Similar to a LOW, an NTOL remains in an employee's personnel file for two years and does not affect the employee's pay, grade, benefits, title, or job responsibilities. *Id.* Before issuing an NTOL, the supervisor must issue a notice in the form of a proposed NTOL and give the employee an opportunity to respond. UMF 12. A proposed NTOL is not disciplinary. *Id.* It does not affect the employee's pay, grade, benefits, or job responsibilities. *Id.*

On December 28, 2011, Mr. James issued Mr. Flores a proposed letter of warning in lieu of a seven-day time-off suspension ("Proposed NTOL") for failure to satisfactorily perform the duties and responsibilities of his position. *See* Doc. 40-3. The Proposed NTOL "is not . . . a disciplinary measure under the post office's regulations." Doc. 40-2 at 12. According to the Proposed NTOL, Mr. Flores failed to meet Mr. James's expectations and failed to discharge his duties conscientiously and effectively in violation of USPS Employee and Labor Relations Manual Section 665.13. UMF 14. The Proposed NTOL cited the Roswell service failure and the Santa Fe rural carrier violations as examples of how Mr. Flores failed to "implement[] the necessary processes to ensure compliance with organization goals and meet the requirements of [his] position." Doc. 40-3 at 4; *see also id.* at 2–3.

The Proposed NTOL informed Mr. Flores of his right to appeal the proposed letter of warning in lieu of a seven-day time-off suspension to the deciding official, Shaun Mossman, Area Manager, Operations Support. UMF 16. Mr. Mossman was Mr. Flores's second-higher-

level manager.  *Id.*  On March 30, 2012, Mr. Flores timely submitted a letter to Mr. Mossman appealing the Proposed NTOL.  UMF 17.

On April 26, 2012, Mr. Mossman issued a letter of decision informing Mr. Flores that he was reducing the Proposed NTOL to a LOW.  UMF 18.  Although Mr. Mossman did not consider Mr. Flores's lack of prior discipline or 33-year service history at USPS to be mitigating factors, he reduced the Proposed NTOL to a LOW based on Mr. Flores's follow-up with the Roswell staff after the service failure.  UMF 20.  Mr. Mossman did not consider Mr. Flores's race or age when deciding to reduce the Proposed NTOL to a LOW.  UMF 23.  After receiving the LOW, Mr. Flores did not experience any loss or change in pay, grade, benefits, title, or job responsibilities.  UMF 24.  The LOW did not significantly change Mr. Flores's employment status at USPS.  *Id.*

On May 29, 2012, Mr. Flores filed his first EEO complaint, which alleged that he had been discriminated against based on his race, color, gender, and age.  Doc. 1-1.  He based his allegations partly[5] on the fact that he "was given Proposed action for 7[-]day suspension while other EAS MPOO's were not."  *Id.*  Mr. Flores identified Mr. James and Mr. Mossman as being responsible for this act of discrimination.  *See* Doc. 1-1; *see also* Doc. 1 at 3.

**B.      Corporate Succession Planning Program and Second EEO Complaint**

USPS has a program called the Corporate Succession Planning ("CSP") program, which is designed to provide development opportunities to top-performing employees who have the potential to assume executive leadership positions.  UMF 25.  The CSP program ran in two-year cycles.  *Id.*  Participation in the CSP program enabled employees to create individual

---

[5] Mr. Flores also alleged he was not selected for a particular position because of discrimination. *See* Doc. 1-1.  This claim is not part of this lawsuit.  *See* Doc. 1 at 3.

development plans ("IDPs") for training and development opportunities and to receive other benefits such as personality assessments and detail assignments. UMF 26. These benefits were not dependent on the particular executive position for which an employee was selected as a potential successor. *Id.* Selection into the CSP program as a potential successor did not guarantee selection for an executive-level Postal Career Executive Service ("PCES") position. UMF 27. Indeed, not all PCES executives were selected from the CSP program, or even from within USPS. *Id.*

From 2010 to 2012, Mr. Flores was in the CSP program as a potential successor in three different pools, including marketing and operations. UMF 28. Mr. Flores's designated readiness level in the marketing and operations pools was "ready now." UMF 29. At the time, the "ready now" status for potential successors in the CSP program was defined as being ready for an executive role within two years with targeted development, and "ready later" meant that the employee would be ready for an executive role within three to five years with targeted development. UMF 30. There was no separate category for someone who was currently ready for an executive role. *Id.*

In 2012, USPS made several changes to the CSP program. UMF 31. Before the changes, employees could nominate themselves for inclusion in the CSP program, but beginning with the 2012 open season, the CSP program required that an executive nominate an employee for the program. *Id.* Final selection into the program was accomplished by a committee of area executives. *Id.* The readiness categories also were changed in 2012. UMF 32. The "ready now" category meant that the potential successor was currently ready for an executive role; "ready within two years" meant readiness for an executive role within two years with targeted

development, and "ready within five years" indicated readiness for an executive role within five years with targeted development. *Id.*

Mr. James retired at the end of 2011. UMF 33. John DiPeri replaced Mr. James and was Mr. Flores's supervisor in 2012. *Id.* Mr. DiPeri was not involved with the Proposed NTOL or LOW. UMF 34.

In 2012, Mr. DiPeri nominated Mr. Flores to be in the CSP program in the Marketing Manager (Area) successor pool although the record is unclear whether he nominated Mr. Flores for the "ready now" or "ready within two years" category. *See* Doc. 40-5 at 2, ¶ 8; Doc. 46 at 34–35.[6] According to Mr. DiPeri, he designated Mr. Flores as "ready within two years" because he believed Mr. Flores needed more recent marketing experience to be considered "ready now" under the new 2012 definition of "ready now." Doc. 40-5 at 2, ¶ 8. When Mr. DiPeri nominated Mr. Flores to the Marketing Manager successor pool, Mr. Flores had not had a marketing job title at USPS in 20 years. Doc. 40-2 at 26. Mr. Flores had been in operations for 20 years. *Id.* at 20. Mr. DiPeri did not know that Mr. Flores had any more recent marketing experience when he made the nomination. Doc. 40-5 at 2, ¶ 8; Doc. 49-1 at 3; *see also* Doc. 40-2 at 19 (in a phone call with Mr. Flores after the nomination, Mr. DiPeri stated that he was not aware that Mr. Flores had recent marketing experience).

According to Mr. DiPeri, he did not nominate Mr. Flores to an operations-related pool even though that was Mr. Flores's current area because he wanted to get a better sense of Mr.

---

[6] Mr. DiPeri stated in two affidavits that he nominated Mr. Flores in the "ready within two years" category. Doc. 40-5 at 2, ¶ 8; Doc. 46 at 34. Mr. Mossman recalled that Mr. Flores's "manager initially rated him as ready now." Doc. 46 at 35. Mr. Mossman further recalled that "Mr. Flores did not have recent marketing experience[;] therefore the consensus was to move him to a 'ready within 2 year' category allowing his manager to assign specific activities to enable him to obtain more recent experience." *Id.* The nomination itself does not appear to be in the record.

Flores's operations capabilities, and he believed Mr. Flores had stronger potential in marketing. Doc. 40-5 at 2, ¶ 10. Mr. DiPeri only nominated employees for the successor pool he believed they had the strongest chance of being selected for, and he did not nominate anyone for more than one pool. *Id.* ¶ 11. Mr. DiPeri was unaware of Mr. Flores's EEO activity when he nominated Mr. Flores to the CSP program in 2012.[7] Doc. 40-5 at 3, ¶ 14. Mr. DiPeri did not consider Mr. Flores's EEO activity in making his CSP nominations. UMF 40. Mr. DiPeri did not receive any direction from Mr. Mossman with regard to Mr. Flores's nomination.[8] UMF 41. Mr. Flores believes that he should have been nominated in the "ready now" category and also for an operations-related pool. *See* Doc. 46 at 4–5.

On or about August 17, 2012, the Western Area executive committee reviewed the CSP program nominations. UMF 42. The committee members included Shaun Mossman, Alan Catlin, Steve Juhl, Debbie Persico, and Simon Storey. UMF 43. Veronica Gallegos served as a liaison to the committee and did not have a vote. *Id.* Other than Mr. Mossman, there is no

---

[7] Although Mr. Flores purports to dispute this fact, *see* Doc. 46 at 5, his "evidence" that Mr. DiPeri knew of his EEO activity is a statement in a management instruction manual that "Executive managers [should] conduct career discussions with top-performing employees to better understand their career goals, strengths, developmental needs, mobility, and interest in an executive assignment," *see* Doc. 46 at 31. At his deposition, Mr. Flores did not know when Mr. DiPeri made the nomination and wasn't sure when he told Mr. DiPeri of his EEO activity. Doc. 49-1 at 1–2.

[8] Mr. Flores purports to dispute this fact, but he does not offer any evidence to contradict it. *See* Doc. 46 at 5. Mr. Flores relies on Mr. Mossman's affidavit, which stated that Mr. DiPeri "initially rated him as [']ready now,[']" but the "consensus [of the committee] was to move him to a 'ready within 2 year' category allowing his manager to assign specific activities to enable him to obtain more recent experience." Doc. 46 at 35. In other words, according to Mr. Mossman, Mr. DiPeri nominated him at one readiness level, and the committee changed the level. Mr. Mossman did not direct Mr. DiPeri to do anything as it was the committee's decision whether to accept an employee into the program and at what level of readiness. *See* UMF 31.

evidence that any other committee member knew of Mr. Flores's prior EEO activity.[9] UMF 44.

The committee considered each nominee's "CSP profile," which summarized the nominee's

education and positions held at USPS.[10] UMF 45. The CSP profile did not include any EEO

activity. *Id.* The committee did not mention or consider Mr. Flores's EEO activity as it

considered his nomination into the CSP program. UMF 48. The committee only considered Mr.

Flores's readiness to assume the role of a marketing manager executive. *Id.* Because Mr. DiPeri

did not nominate Mr. Flores for placement in any other pools, the committee did not consider

him for placement in any other pool.[11] UMF 49. In December 2012, Mr. DiPeri informed Mr.

Flores that he had been accepted into the CSP program in one successor pool—Marketing

Manager (Area)—and was listed as "ready within two years." UMF 50. On February 5, 2013,

Mr. Flores filed a second EEO complaint alleging that being placed in the "ready in two years"

---

[9] Mr. Flores purports to dispute this fact because "Mr. Storey had direct oversight of the EEO department," and he would have known about Mr. Flores's EEO complaint by virtue of his position. Doc. 46 at 6. But whether Mr. Storey had actual knowledge of Mr. Flores's complaint is pure speculation and not supported by any admissible evidence.

[10] Mr. Flores purports to dispute this fact, but the only evidence he offers in contradiction is a letter from Steve Juhl, one of the committee members, stating that he thought highly of Mr. Flores. *See* Doc. 46 at 6, 48. Nothing in the letter suggests that the committee did not review each nominee's CSP profile, or that there was any EEO information contained in the profile. *See id.* at 48. Mr. Flores's primary complaint is that during Mr. Flores's deposition, the Assistant U.S. Attorney mistakenly told Mr. Flores that Mr. Juhl was deceased, which was not true. *See id.* at 6.

[11] Mr. Flores purports to dispute this fact, but the evidence on which he relies is inadmissible hearsay. *See* Doc. 46 at 7 (mistakenly referring to "Exhibit 24"; the correct exhibit is Exhibit 34); *see also id.* at 49 (Exhibit 34). Exhibit 34 is a summary of an EEO Dispute Resolution Specialist's investigation. Doc. 46 at 49. The summary states that Mr. DiPeri "indicated the following: . . . . The Counselee [Mr. Flores] was nominated for several groups but was only selected for one group." *Id.* The investigator's description of Mr. DiPeri's statement is hearsay and is not admissible. *See Payan v. United Parcel Service*, 905 F.3d 1162, 1171 (10th Cir. 2018). The Court will not consider this evidence. Mr. DiPeri himself stated that he only nominated Mr. Flores for placement in the Marketing Manager (Area) successor pool. Doc. 40-5 at 1–2, ¶¶ 6, 11.

category rather than "ready now" category for the Marketing Manager (Area) successor pool, and not being selected for any other pool, constituted retaliation for his first EEO complaint. UMF 51.

In 2013, Mr. Flores requested and received a detail as an EAS-25 Marketing Manager (District) in Phoenix. Doc. 40-5 at 4, ¶ 23; Doc. 40-2 at 32. In 2015, Mr. Flores was detailed to Long Beach to serve as an EAS-26 acting postmaster. Doc. 40-5 at 4, ¶ 24; Doc. 46 at 51. Mr. Flores declined to stay in California, Doc. 40-5 at 4, ¶ 24; Doc. 46 at 51, and he retired from USPS in 2017, still in an EAS-25 position, UMF 59.

## II.    Discussion

### A.  Legal Standard for Summary Judgment

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant bears the initial burden of establishing that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "[T]he movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). If this burden is met, the non-movant must come forward with specific facts, supported by admissible evidence, which demonstrate the presence

of a genuine issue for trial. *Celotex*, 477 U.S. at 324. The non-moving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the non-movant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted).

At the summary judgment stage, the Court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* Summary judgment may be granted where "the evidence is merely colorable, or is not significantly probative." *Id.* at 249–50 (internal citations omitted).

### B. The Defendant's Motion for Summary Judgment

In count I of his complaint, Mr. Flores alleges that USPS discriminated against him on the basis of race and age by issuing him a "Proposed Letter of Warning in Lieu of 7 Day Time-Off Suspension for Failure to Satisfactorily Perform the Duties and Responsibilities of his position," in violation of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act of 1967. Doc. 1 at 3. Count II of the complaint alleges that the USPS retaliated against Mr. Flores for filing an EEO complaint by removing him "from CSP lists [on] which he had been listed for almost two decades." *Id*.

Defendant contends that Mr. Flores's claims of race and age discrimination fail because he cannot establish a prima facie case of discrimination as he cannot show that that he suffered an adverse employment action.  Doc. 40 at 11–14.  Defendant also argues that Mr. Flores's discrimination claims fail because the USPS has articulated a legitimate, non-discriminatory explanation for issuing the LOW, and Mr. Flores has failed to demonstrate pretext.  Doc. 40 at 14.  Defendant further contends that the Court should grant summary judgment on Mr. Flores's retaliation claim because Mr. Flores did not suffer a materially adverse employment action after he filed his EEO complaint, he cannot show a causal link between his nomination for the CSP program and his EEO complaint, and the USPS has articulated non-retaliatory reasons for his nomination which Mr. Flores cannot show are pretextual.  *See id.* at 15−23.

Mr. Flores does not address the defendant's argument that the issuance of the LOW did not amount to an adverse employment action.  *See* Doc. 46 at 8–11.  Instead, Mr. Flores focuses almost entirely on his retaliation claim.  He argues that he "was adversely impacted by non-placement in the PCES Operations pool and [his] reduction from 'ready now' status in Marketing because it fr[oze] [him] out . . . from consideration for promotion."  *Id.* at 9–10.  He also argues that his non-placement in the operations pool and his "ready in two years" status in the marketing pool resulted in "salary stagnation," which "meets the requirement of an adverse action."  *Id.* at 10.  He further argues that the reasons given for his placement in the CSP programs are pretextual.  *See id.*  He also asserts that several less qualified comparators were placed in successor pools, *see id.* at 8–9, presumably in the pools and at the level he would have preferred.

For the following reasons, I agree that defendant is entitled to summary judgment in his favor on Mr. Flores's discrimination and retaliation claims.

### C. Mr. Flores's Discrimination Claims

Under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), Mr. Flores bears the initial burden to establish a prima facie case of race and/or age discrimination. *See Payan v. United Parcel Service*, 905 F.3d 1162, 1168 (10th Cir. 2018); *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). For both types of discrimination, Mr. Flores must demonstrate that he is a member of a protected class, that he suffered an adverse employment action, and that the challenged action occurred under circumstances giving rise to an inference of discrimination. *See id.*

The "adverse employment action" element requires a *materially* adverse action taken against the employee, something that amounts to "a significant change in the plaintiff's employment status . . . ." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007) (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006), *abrogated in part on other grounds by Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).[12] An adverse action cannot be a trivial employment action. *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018). Examples of adverse actions include those that result in an increased "likelihood that the plaintiff will be terminated," actions that "undermine[] the plaintiff's current position," or those that limit "the plaintiff's future employment opportunities." *Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1137 (10th Cir. 2005) (citing *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998)). In *Schuler v. City of Boulder*, the Tenth Circuit held that reduction of duties, a written reprimand, and the assigning of low performance

---

[12] "[W]hile *Burlington Northern* modified our retaliation standards for adverse actions, it had no similar effect on our discrimination jurisprudence." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007).

ratings collectively constituted an adverse action. *See* 189 F.3d 1304, 1309–10 (10th Cir. 1999).

But in *Anderson v. Clovis Mun. Schools*, the court held that the issuance of a formal reprimand

and an "employee growth plan" did not amount to an adverse action. 265 F. App'x 699, 704

(10th Cir. 2008) (unpublished). An adverse action can only occur when it "alters the employee's

compensation, terms, conditions, or privileges of employment, or adversely affects his . . . status

as an employee." *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000) (quoting

*Sanchez v. Denver Pub. Schools*, 164 F.3d 527, 533 (10th Cir. 1998) (internal quotation marks

and brackets omitted)).

In the Tenth Circuit, placing an employee on a professional improvement plan or issuing

a formal warning alone does not constitute an adverse employment action unless it puts the

employee at risk of termination or affects his or her salary or status. *See Haynes*, 456 F.3d at

1224–25. In *Haynes*, the plaintiff—who had failed to meet her sales quota—argued that being

placed on a personnel improvement plan ("PIP") constituted an adverse employment action. The

Tenth Circuit disagreed, holding that placement on such a plan was not adverse because the

plaintiff "was not demoted, her pay did not change, and her responsibilities were not

significantly modified. Instead, she was presented with clear goals to achieve her continued

employment." *Id.* at 1225.

In this case, the issuance of the LOW had even less of an effect on Mr. Flores than the

PIP had on the plaintiff in *Haynes*. Mr. Flores does not directly address the defendant's

argument that a LOW does not constitute an adverse employment action. *See* Doc. 46 at 2–5, 8–

9. Instead, he focuses primarily on his assertion that he should not have received a Proposed

NTOL. *See id.* Indeed, Mr. Flores seems to ignore the fact that the Proposed NTOL was

reduced to a LOW. *See id.* Nevertheless, the evidence is undisputed that Mr. Flores successfully

appealed the Proposed NTOL, that it was reduced to a LOW, and that the LOW remained in Mr. Flores's personnel file for two years but otherwise did not affect his pay, grade, benefits, title, or job responsibilities. UMFs 17, 18, 24. Although Mr. Flores complains that he should not have received any discipline whatsoever, he completely fails to explain how the LOW—the lowest form of discipline possible—amounted to a significant change in his employment status. There is no evidence that the LOW increased the likelihood that Mr. Flores would be terminated, or that it undermined his position or decreased his employment opportunities. Mr. Flores has failed to establish that he suffered an adverse employment action, and he therefore cannot establish a prima facie case of discrimination.[13] The defendant is entitled to summary judgment in his favor on Mr. Flores's discrimination claim.

### D. Mr. Flores's Retaliation Claim

Title VII makes it unlawful to retaliate against an employee for opposing any practices that the statute makes unlawful. 42 U.S.C. § 2000e–3(a). "To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008). This burden may be satisfied in one of two ways. Under the direct or "mixed motives" approach, a plaintiff may offer direct evidence that retaliation played a "motivating part" in the adverse employment decision. *Id.* at 1225. If the plaintiff can prove that retaliatory animus was a motivating factor, the burden then shifts to the employer to demonstrate that it would have taken the same action absent the retaliatory motive. *Id.*

---

[13] Because Mr. Flores cannot establish a prima facie case of discrimination, it is not necessary for the Court to address the defendant's argument that even if Mr. Flores could establish a prima facie case, the USPS had legitimate, non-discriminatory reasons to issue the LOW. *See* Doc. 40 at 14.

Alternatively, in the absence of direct evidence, a plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas*, 411 U.S. at 802–04. Under this framework, Mr. Flores first must establish a prima facie case of retaliation by showing (1) "that []he engaged in protected opposition to discrimination," (2) "that a reasonable employee would have found the challenged action materially adverse," and (3) "that a causal connection exists between the protected activity and the materially adverse action." *PVNF, L.L.C.*, 487 F.3d at 803. In *Burlington Northern*, the Supreme Court applied a more lenient standard in analyzing the antiretaliation provisions of Title VII than the standard applied in straight discrimination claims. *Piercy*, 480 F.3d at 1203 & n.12. In the retaliation context, a challenged action may be adverse if "a reasonable employee would have found [it] materially adverse." *McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (quoting *Mickelson v. New York Life Ins. Co*., 460 F.3d 1304, 1315 (10th Cir. 2006)). The relevant inquiry is whether the employer's action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (internal quotations omitted). Still, the Supreme Court emphasized that materiality is important; the antiretaliation provisions do not apply to trivial harms. *Id.*

To establish the requisite causal connection between his protected conduct and the materially adverse action, Mr. Flores must show that a desire to retaliate against him for his protected activity motivated the USPS to not place him in his preferred successor pools at the ready-now level. *See Wells v. Colo. Dep't of Transp*., 325 F.3d 1205, 1218 (10th Cir. 2003). As a prerequisite to this showing, Mr. Flores must come forward with evidence from which a reasonable factfinder could conclude that those who decided to place him in the CSP marketing pool at the ready-within-two-years level had knowledge of his protected activity. *See Montes v.*

*Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) ("To satisfy [the causal connection] element, a plaintiff must show that the individual who took adverse action against [him or her] knew of the employee's protected activity." (quotation omitted)).

"Once the plaintiff successfully asserts a prima facie retaliation case, the burden shifts to the defendant (i.e., employer) to come forward with a legitimate, non-retaliatory rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (internal quotation marks, ellipses, and citation omitted). As the Tenth Circuit has explained, "[p]retext can be inferred from evidence revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanation," or it can be shown "by providing direct evidence discrediting the proffered rationale, or by showing that the plaintiff was treated differently from others similarly situated." *Id.* (internal quotation marks and citations omitted). In this case, Mr. Flores has offered no direct evidence of retaliation; he therefore must proceed under the *McDonnell Douglas* burden-shifting framework. *See generally* Doc. 46 at 9–11.

### 1. *Protected Opposition to Discrimination*

With respect to the first prong of the *McDonnell Douglas* framework, there is no dispute that Mr. Flores's EEO complaint constituted protected opposition to discrimination. Mr. Flores has satisfied the first element of a prima facie case of retaliation.

### 2. *Materially Adverse Action*

In the context of a retaliation claim, a materially adverse action is an action "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57. Courts must "liberally define[ ] the phrase adverse employment action. . . . Such actions are not simply limited to monetary losses in

16

the form of wages or benefits. Instead, [courts must] take a case-by-case approach, examining the unique factors relevant to the situation at hand." *Payan*, 905 F.3d at 1172 (quoting *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004)).

Here, Mr. Flores alleges that being placed in only the Marketing Manager (Area) successor pool at the ready-within-two-years category constituted a materially adverse action which would dissuade a reasonable worker from making or supporting a charge of discrimination. First, there is no evidence that Mr. Flores's placement into the CSP program was adverse at all. Although Mr. Flores was in the CSP program as a potential successor in three different pools from 2010 to 2012, and was categorized as "ready now" in the marketing and operations pool, the program was changed for the cycle beginning in 2012. *See* UMF 31. Before 2012, an employee could nominate him or herself for any pool. *Id.* Beginning in 2012, the nomination process became more selective, and an executive needed to nominate an employee into the program. *Id.* Further, the pre-2012 "ready now" category—which included those ready for an executive role within two years—was split into two categories: "ready now" and "ready within two years." UMFs 30, 32. Thus, there is no evidence to suggest that Mr. Flores's nomination to the CSP program in 2012 was somehow an adverse action. An executive nominated Mr. Flores for the program, he was selected into the program, and he was placed at a level that was equivalent to where he had been before the program was changed. Further, Mr. Flores acknowledged that the fact that he was selected for only one pool at the ready-within-two-years level did not affect the benefits he received through the program. *See* UMF 26; Doc. 40-2 at 21. In short, Mr. Flores's selection into the CSP program in 2012 was a *benefit*—not harmful—and it would not dissuade a reasonable worker from filing an EEO complaint.

Second, even if Mr. Flores's selection into the CSP program in 2012 could somehow be characterized as an adverse action, it was not "materially" adverse. The Tenth Circuit has held that being placed on an employee improvement plan does not qualify as a materially adverse action under *Burlington Northern. Payan*, 905 F.3d at 1173–74. On the other hand, a demotion and a failure to reinstate supervisory duties both qualify as materially adverse actions under *Burlington Northern. See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1317, 1319 (10th Cir. 2017). Being placed in off-duty status immediately with the threat of not being paid also qualifies as a materially adverse action. *See Green v. Donahoe*, 760 F.3d 1135, 1138, 1146–47 (10th Cir. 2014), *reversed on other grounds sub nom Green v. Brennan*, 136 S. Ct. 1769 (2016).

In this case, being placed in the Marketing Manager (Area) successor pool in the ready-within-two-years category was not onerous, and certainly not as onerous as being placed on an improvement plan. As Mr. Flores explained during his deposition,

> In my case, I received a lot of benefits. One of the best ones I had was a 360 process where they actually sent somebody to my home and followed me around for two weeks, and they interviewed my wife, my kids, my – my peers, my subordinates, my boss, and I got a book, you can see it, about that thick, two inches thick telling me how I could become a better leader, better manager.
> And I was only one of four or five people that were allowed to do that. So, I mean, they really try hard to identify how you can contribute more, what your weaknesses are. There's a lot of profile analysis. . . .
> I had, was sent to a variety of detail assignments, that was back in headquarters, working with them on human resources to determine the paychecks, the payroll for human resources. So lots of stuff. It's a big growth opportunity, too.

Doc. 40-2 at 21. Mr. Flores acknowledged that the benefits he received were essentially the same for everyone in the CSP program, regardless of what pool they were in. *Id.*; *see also* UMF 26. Mr. Flores further acknowledged that being selected for the CSP program did not guarantee being selected for an executive-level PCES position, and that it was "speculative" to think he would have gotten a PCES position had he been placed in both

the operations and marketing pools at the ready-now level. *See* Doc. 40-2 at 33; *see also* UMF 27. Although Mr. Flores now argues that non-placement in the CSP operations pool and "reduction from 'ready now' status in Marketing" froze him out from consideration for promotion and resulted in "salary stagnation," he fails to cite to any evidence to support his argument. *See* Doc. 46 at 9–10. Mr. Flores cannot establish a prima facie case of retaliation because he cannot show that he suffered a materially adverse employment action.

### 3. *Causal Connection Between Materially Adverse Action and Protected Activity*

Mr. Flores also cannot establish a prima facie case of retaliation because he cannot establish a causal connection between his CSP placement and his EEO complaint. The Tenth Circuit has not established a precise temporal line for determining whether the requisite proximity is present to establish the causation element of a prima facie retaliation case. If the materially adverse action occurs within one and a half months after the protected activity, temporal proximity alone may be enough to establish an inference of causation, but if the adverse action occurs three months or more after the protected activity, then timing alone is not sufficient to establish the causation element. *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013); *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation." (citations omitted)). It's not clear, however, "where along the temporal line beyond one and one-half months but short of three months, the adverse action's timing ceases to be sufficient, standing alone, to establish the requisite causal inference." *Conroy*, 707 F.3d at 1181; *see also Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (suggesting that "two months and one week" was "probably too [long] . . . to establish

causation by temporal proximity alone"). Here, Mr. Flores filed his EEO complaint on May 29, 2012, and the executive committee decided to accept Mr. Flores into the CSP program on about August 17, 2012—or a little more than two months and two weeks after Mr. Flores's protected activity. This time period is too long to establish, by itself, the causal inference necessary to establish a prima facie case of retaliation. *See Meiners*, 359 F.3d at 1231. Mr. Flores therefore must provide other evidence of a causal connection to establish a prima facie case of retaliation.

The biggest problem for Mr. Flores in showing a causal connection between the filing of his EEO complaint and his placement in the CSP program is that only one person involved in the process—Shaun Mossman—was aware that Mr. Flores had filed an EEO complaint. There is no evidence that Mr. DiPeri knew of Mr. Flores's EEO activity before Mr. DiPeri nominated Mr. Flores for the CSP program in the Marketing Manager (Area) pool. *See* Doc. 40-5 at 3, ¶ 14 (Mr. DiPeri stated in affidavit that he was unaware of Mr. Flores's EEO complaint when he made the nomination); Doc. 49-1 at 1–2 (Mr. Flores testified he did not recall when he informed Mr. DiPeri of his EEO complaint.).[14] As Mr. DiPeri alone was responsible for deciding whether to nominate Mr. Flores for one or more successor pools, and because Mr. DiPeri was unaware of Mr. Flores's EEO activity at the time he made the nomination, the fact that he nominated him for only one successor pool could not have been in retaliation for Mr. Flores's EEO activity.[15] *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("[A]n employer cannot

---

[14] Mr. Flores testified in his deposition that he suspected Mr. Mossman directed Mr. DiPeri to make the nomination as he did, Doc. 40-2 at 27, but he did not provide any evidence to support this theory. *See generally* Doc. 46. Of course, "[u]nsupported conclusory allegations . . . do not create a genuine issue of fact." *L&M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000). Without any evidence that Mr. Mossman influenced Mr. DiPeri's decision to nominate Mr. Flores as he did, the Court need not address the "reverse cat's paw" theory raised in defendant's motion. *See* Doc. 40 at 19–20.

[15] As explained in footnote 11, *supra*, Mr. Flores contends that Mr. DiPeri nominated him for more than one successor pool, but the evidence on which he relies is inadmissible hearsay.

engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII").

Defendant concedes that Mr. Mossman knew of Mr. Flores's EEO activity and that he was involved in deciding whether to accept Mr. Flores into the Marketing Manager (Area) successor pool at the ready-within-two-years level. *See* UMFs 42–44. Mr. Mossman was a member of the five-member committee that decided to accept Mr. Flores into the CSP program. UMF 43. But Mr. Flores does not dispute that no one on the committee mentioned or considered Mr. Flores's EEO activity when the committee decided to accept him into the CSP program at the ready-within-two-years level. *See* UMF 48; *see also* Doc. 46 at 6–7 (specifically disputing UMFs 47 and 49, but not 48). Given that Mr. Flores has no evidence that his EEO activity was even mentioned, much less considered, when the committee made its decision, and that only one member of the committee even knew about his EEO activity, no reasonable jury could find a causal connection between Mr. Flores's protected activity and his placement into the Marketing Manager (Area) successor pool at the ready-within-two-years level. Defendant is entitled to summary judgment in his favor because Mr. Flores cannot establish a causal connection between the filing of his EEO complaint and his placement in the CSP program.[16]

## IV.    Conclusion

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment (Doc. 40) in its entirety. Summary Judgment is GRANTED in favor of defendant

---

[16] Because Mr. Flores cannot establish a prima facie claim of retaliation, it is not necessary for the Court to address the defendant's argument that even if Mr. Flores could establish a prima facie case, USPS had legitimate, non-retaliatory reasons to place Mr. Flores in the CSP program and level as it did. *See* Doc. 40 at 22−23.

Louis DeJoy, as Postmaster General, on all of Mr. Flores's claims as alleged in his complaint, and this lawsuit is dismissed with prejudice.

**IT IS SO ORDERED.**

Laura Fashing
United States Magistrate Judge